# United States Court of Appeals
## For the Eighth Circuit

_____

No. 19-2323
_____

Twyla McElree; Mikaela Gossman, Surviving Spouse of Jonathan Tyler Gossman, on her own behalf, next friend of L.R.G., next friend of Z.A.G.

*Plaintiffs - Appellants*

v.

City of Cedar Rapids

*Defendant - Appellee*

Wayne Jerman, in his official capacity; Brent Long, in his official capacity; Jeff Hembera, in his official capacity

*Defendants*

Nathan Juilfs, in his individual capacity

*Defendant - Appellee*

Christopher Bieber, in his official capacity

*Defendant*

Lucas Jones, in his official capacity; Brandon Boesenberg, in his official capacity; Bryson Garringer, in his official capacity

*Defendants - Appellees*

John Does, 1-5

*Defendants*

Appellate Case: 19-2323    Page: 1    Date Filed: 12/23/2020 Entry ID: 4987876

_____

Appeal from United States District Court
for the Northern District of Iowa - Cedar Rapids
_____

Submitted: September 23, 2020
Filed: December 23, 2020
_____

Before COLLOTON, GRUENDER, and GRASZ, Circuit Judges.
_____

GRASZ, Circuit Judge.

Officers from the Cedar Rapids Police Department shot and killed Jonathan Gossman during an altercation after stopping his vehicle to investigate possible drug crimes. Several of Gossman's relatives sued the officers and the city asserting various federal and state law claims under the United States Constitution, the Iowa Constitution, and Iowa tort law. The district court[1] granted summary judgment to the officers and the city on all claims. We affirm.

## I. Background

In October 2015, Investigators Brandon Boesenberg and Bryson Garringer were conducting surveillance in a Walgreens parking lot. The officers sat in an unmarked vehicle to avoid detection. Part of their stakeout included electronically tracking purchases of pseudoephedrine[2] in the area.

---

[1]The Honorable Leonard T. Strand, Chief Judge, United States District Court for the Northern District of Iowa.

[2]Pseudoephedrine is a non-prescription drug used to treat congestion caused by colds and allergies. It is also used illicitly as a methamphetamine precursor. The officers used the National Precursor Log Exchange ("NPLEx"), which allowed them

The officers noticed a pickup truck in the back of the parking lot. Two people who the officers believed had connections to methamphetamine manufacturing were in and about the truck. Annabelle Santos (one of the truck's occupants) exited the truck, entered the Walgreens, and purchased pseudoephedrine at 9:55 p.m. The officers identified her using the NPLEx as she left the store and headed back to the truck. At 9:59 p.m., the officers were alerted to another pseudoephedrine purchase across the street at a different pharmacy. The officers saw a person who they recognized as involved with methamphetamine walk up to the truck from the direction of the other pharmacy.[3] Soon after, the officers saw Gossman exit the truck, purchase pseudoephedrine in the Walgreens, and return to the truck. While the truck was parked, the officers observed a flurry of movement inside and near the truck and a flashlight shining from inside.

The officers began to suspect the individuals observed in and about the truck were purchasing pseudoephedrine to make methamphetamine. The truck soon left the parking lot, dropped off a passenger at a gas station across the street, and drove through the city. Boesenberg and Garringer followed the truck, as did Sergeant Nathan Juilfs who responded to a request for assistance from the other officers. The officers decided to stop the truck because they suspected it contained evidence of methamphetamine manufacturing. After receiving a call for a K9 unit, Officer Lucas Jones arrived at the scene with his police dog, Bane.

---

to monitor all pseudoephedrine purchases at their location in real time. When an attempted purchase was made nearby, the officers received the time, location, purchaser's driver's license information, and purchasing history.

[3]The officers believed the actual purchaser may have given the pseudoephedrine to this person who then walked it to the truck.

When the officers approached the truck, they asked Dillon Graf and Santos to exit and began interviewing them. After being prompted, Graf produced a knife, a methamphetamine pipe, and some prescription pills.

While the other officers questioned Graf and Santos, Sergeant Juilfs questioned Gossman through the truck's open back window. After hearing about Graf's pipe, Juilfs told Gossman he would be searched. Gossman repeatedly reached toward his own waist. Juilfs ordered Gossman to put his hands up, and Juilfs removed a knife on a lanyard from around Gossman's neck. Graf then informed Garringer that there was a shotgun in the back seat. Several of the officers drew their firearms and told Gossman to exit or he would be removed from the truck. Gossman refused.

Gossman then got out of the truck, but when his feet hit the ground, he started moving. With his weapon still drawn, Boesenberg used his other arm to attempt to restrain Gossman. However, to avoid firing accidentally, Boesenberg quickly released him. Gossman took off running. Bane, the service dog, and Officers Jones and Garringer chased him.

Jones and Garringer both noticed that the entire time Gossman ran, he held the front of his waistband. After a short chase, Bane caught up with Gossman and bit his arm. After running a few more steps, Gossman fell, twisted, and drew a handgun from his waistband. Garringer yelled "gun." He testified that he believed Gossman fired at him and that he heard a clap and saw a flash of light. Garringer stopped abruptly, slipped, and fell to the ground. Jones heard the shout and saw Garringer fall before popping back up. Jones and Garringer then fired repeatedly at Gossman, until they determined he was no longer a threat. Gossman was pronounced dead at the scene. The medical examiner's report and further investigation revealed that Gossman was shot 24 times. An investigation also revealed Gossman had methamphetamine in his system, and his 9mm handgun was loaded but had not been fired.

Gossman's surviving family members sued the City of Cedar Rapids and the officers involved in Iowa District Court asserting nine separate counts including violations of the United States Constitution, the Iowa Constitution, and Iowa tort law. The city removed the case to federal court and ultimately moved for summary judgment. The district court granted the city summary judgment on all claims.

## II. Analysis

"We review the district court's grant of summary judgment de novo, taking the facts in the light most favorable to the nonmoving party." *See Oglesby v. Lesan*, 929 F.3d 526, 531–32 (8th Cir. 2019). We draw all reasonable inferences in favor of the family as the nonmoving party. *Id.* Summary judgment is proper if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The nonmoving party must cite to specific facts in the record demonstrating a genuine issue of fact for trial and may not rely solely on allegations." *Lucke v. Solsvig*, 912 F.3d 1084, 1087 (8th Cir. 2019).

The family argues that the officers lacked the reasonable suspicion required to stop the truck and detain Gossman. The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend. IV. Although officers need probable cause to affect an arrest, for an investigatory stop, "the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity 'may be afoot.'" *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). "An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez*, 449 U.S. 411, 417 (1981).[4]

---

[4]The Iowa Supreme Court usually views the "Iowa Constitution's search and seizure provisions to track with federal interpretations of the Fourth Amendment." *State v. Brown*, 930 N.W.2d 840, 847 (Iowa 2019) (quoting *State v. Christopher*, 757 N.W.2d 247, 249 (Iowa 2008)). An excessive force claim under the Iowa

As a standard for initiating an investigative stop, reasonable suspicion hovers well below preponderance of the evidence and need not rise to the level of probable cause. *Arvizu*, 534 U.S. at 274. It is a "commonsense, nontechnical concept[]" that requires more than a hunch. *Ornelas v. United States*, 517 U.S. 690, 695 (1996). Officers must have "'a particularized and objective basis' for suspecting the person stopped of criminal activity." *Id.* at 696 (quoting *Cortez*, 449 U.S. at 417–18). We look "to the totality of the circumstances, 'allow[ing] officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them.'" *United States v. Dortch*, 868 F.3d 674, 680 (8th Cir. 2017) (alteration in original) (quoting *Arvizu*, 534 U.S. at 273).

We turn first to the stop of the truck that was carrying Gossman. The district court found the stop was supported by reasonable suspicion based on (1) two to three separate pseudoephedrine purchases in a twenty-minute span, (2) known methamphetamine manufacturers associated with the truck, and (3) suspicious levels of activity in and around the truck. We agree that these facts, taken together, support reasonable suspicion that criminal activity may have been afoot.

This case is similar to *United States v. Ameling*, 328 F.3d 443 (8th Cir. 2003). There, we upheld the investigatory stop of two people who purchased pseudoephedrine separately from the same store before meeting up at a shared car, and who had also purchased a lithium battery (another methamphetamine precursor) at a different store. *Id.* at 445. The individuals' movements in the stores and parking lots—splitting up and rejoining one another periodically—and their separate purchases of methamphetamine precursors supported a finding of reasonable suspicion. *Id.* at 448. Although this case lacks a lithium battery purchase, the facts are otherwise quite similar. In both cases, multiple people purchased

---

Constitution is also substantially similar to a claim under the United States Constitution. *State v. Dewitt*, 811 N.W.2d 460, 467 (Iowa 2012). Because the parties have not articulated any reason to treat their state law claims differently in this case, we assess the state constitutional claims under the same general standards as their federal constitutional claims.

-6-

pseudoephedrine separately within a short time and rejoined one another at the same vehicle. And here, there are additional facts supporting reasonable suspicion, such as (1) suspicious movement in and around the truck and (2) known methamphetamine manufacturers standing around the truck. *Ameling*'s reasonable suspicion holding supports the same here.

The family raises several arguments to the contrary. First, they argue that the officers could not be sure they had definitively identified Gossman, Santos, or anyone else before the stop. But reasonable suspicion does not require certainty, including in the identification context. *See Arvizu*, 534 U.S. at 274 (noting how reasonable suspicion is a considerably lower standard than the preponderance of evidence standard); *United States v. Lopez-Tubac*, 943 F.3d 1156, 1158–59 (8th Cir. 2019) (finding an officer's identification mistake did not negate reasonable suspicion). Further, the officers' suspicions as to the participants' identities were not developed in isolation. Combined with the other suspicious behavior observed, their suspicions about the participants' identities contributed to the reasonable suspicion of the officers.

Second, the family argues that legally purchasing packages of cold medicine is not against the law and the officers observed no traffic violations. In support, they cite two state court cases holding the legal purchase of cold medicine did not support reasonable suspicion. *See State v. Schneider*, 80 P.3d 1184, 1189–90 (Kan. Ct. App. 2003); *People v. Lomas*, 812 N.E.2d 39, 47–48 (Ill. App. Ct. 2004). Their argument fails for two reasons.

First, under our precedent, lawful activity can—and often does—help form the basis for reasonable suspicion. *See, e.g.*, *Ameling*, 328 F.3d at 448 (concluding legal purchases, in addition to other factors, supported a finding of reasonable suspicion); *see also Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (noting "nervous, evasive behavior," though not illegal, "is a pertinent factor in determining reasonable suspicion"). Activity that does not directly indicate wrongdoing but suggests criminality is highly relevant to a reasonable-suspicion determination. *See Sokolow*,

490 U.S. at 10 ("'[I]nnocent behavior will frequently provide the basis for a showing of' . . . reasonable suspicion." (quoting *Illinois v. Gates*, 462 U.S. 213, 243–44 n.13 (1983))).

Second, the purchases of pseudoephedrine cold medicine (by separate people tied to the same car) was not the only consideration that led to an investigative stop here. The officers also observed individuals known to be methamphetamine users and manufacturers hanging around the truck and suspicious activity inside the truck. Collectively, the officers' observations were enough to support the belief that criminal activity might have been afoot.

Next, we hold the officers' first attempt to detain Gossman was also supported by reasonable suspicion. During a lawful *Terry* stop, officers can "take any measures that are reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *Waters v. Madson*, 921 F.3d 725, 737 (8th Cir. 2019) (cleaned up) (quoting *United States v. Sanford*, 813 F.3d 708, 713 (8th Cir. 2016)). Depending on the circumstances, officers may instruct the driver and passengers to step out of the car, prevent passengers from leaving the scene, and increase restraint proportionate to uncooperative behavior during an investigative detention. *See id.* at 738; *United States v. Smith*, 645 F.3d 998, 1001 (8th Cir. 2011).

Here, the officers had reason to believe Gossman was armed because the driver of the truck had told them there was a shotgun in the back seat near Gossman, and Juilfs had already removed a knife from around Gossman's neck. In addition to the officers' suspicions that Gossman was armed, Gossman's lack of cooperation and his sudden movements in the back seat supported restraining him. *See Waters*, 921 F.3d at 738 (finding the use of handcuffs and placing the suspect in a squad car were justified where the suspect displayed argumentative behavior and refused to obey orders). As soon as Gossman exited the truck, the record indicates he physically struggled with Boesenberg and ran off. Jones's decision to release Bane to subdue the struggling Gossman and keep him from leaving was not unreasonable. *See Mann v. Yarnell*, 497 F.3d 822, 826 (8th Cir. 2007) (concluding the use of a

-8-

Appellate Case: 19-2323     Page: 8     Date Filed: 12/23/2020 Entry ID: 4987876

police dog to control a non-compliant suspect was reasonable where the suspect was merely twisting on the ground).

The family next argues the officers' use of deadly force was excessive. Our precedent says otherwise. Succeeding on an excessive force claim requires a showing that the officers used unreasonable force "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Swearingen v. Judd*, 930 F.3d 983, 987 (8th Cir. 2019) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). When analyzing reasonableness, a court must consider "that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 988. The use of deadly force is constitutionally reasonable under the Fourth Amendment "if an officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others." *Thompson v. Dill*, 930 F.3d 1008, 1013 (8th Cir. 2019) (quoting *Morgan v. Cook*, 686 F.3d 494, 497 (8th Cir. 2012)). That rule covers an officer's objectively reasonable mistake. *Id.* Before using deadly force, officers should give "some warning" if it is "feasible." *Dooley v. Tharp*, 856 F.3d 1177, 1181 (8th Cir. 2017) (quoting *Loch v. City of Lichfield*, 689 F.3d 961, 967 (8th Cir. 2012)).

Here, Garringer and Jones reasonably believed Gossman posed a serious threat to their safety and that deadly force was justified. When Bane caught him, Gossman drew a handgun. That drawn handgun "pose[d] a threat of serious physical harm" to the officers and justified their use of deadly force against Gossman. *Thompson*, 930 F.3d at 1013.

The family advances two primary arguments as to why it was unreasonable for the officers to shoot Gossman. They first emphasize that Garringer mistakenly believed Gossman fired his gun. They also argue the officers should have warned Gossman before firing. Neither argument has merit considering the totality of the circumstances. First, we need not resolve whether Garringer's mistaken belief was

-9-

Appellate Case: 19-2323     Page: 9     Date Filed: 12/23/2020 Entry ID: 4987876

reasonable here since deadly force was authorized because Gossman pulled a gun and thus the officers were "faced with an apparently loaded weapon." *Smith v. City of Brooklyn Park*, 757 F.3d 765, 772 (8th Cir. 2014) ("[N]o constitutional or statutory right exists that would prohibit a police officer from using deadly force when faced with an apparently loaded weapon." (quoting *Sinclair v. City of Des Moines*, 268 F.3d 594, 596 (8th Cir. 2001) (per curiam))). Second, Gossman's family is correct that a warning should be given if it is feasible. *See Dooley*, 856 F.3d at 1181. But where the decision to shoot must be made in a "split-second," as here, it is reasonable to forgo a warning. *See Swearingen*, 930 F.3d at 987. In light of the above, we hold the use of deadly force did not violate the Fourth Amendment.

The family's state law assault and false arrest claims also fail because the officers did not act unreasonably in using deadly force and did not act unlawfully in detaining Gossman. Under Iowa law, "an assault only occurs if the peace officer does not reasonably believe the particular force was necessary in the circumstances." *Johnson v. Civil Serv. Comm'n*, 352 N.W.2d 252, 257 (Iowa 1984); Iowa Code § 804.8. And a false arrest occurs only if there is an unlawful detention or restraint. *Thomas v. Marion Cnty.*, 652 N.W.2d 183, 186 (Iowa 2002). Because the officers' use of deadly force was reasonable and the detention of Gossman was lawful, the district court properly disposed of the assault and false arrest claims.[5]

### III. Conclusion

For the foregoing reasons, we affirm.

_____

---

[5]The family also argues the district court erred in deciding to strike certain portions of the record and their statement of facts offered in support of summary judgment. However, they admit these issues only need to be resolved if we reverse the grant of summary judgment and remand for further proceedings. Appellant's Br. at 17, 48, 55. Having affirmed the grant of summary judgment, we need not reach these issues.

# United States Court of Appeals
### *For The Eighth Circuit*
Thomas F. Eagleton U.S. Courthouse
111 South 10th Street, Room 24.329
**St. Louis, Missouri 63102**

**Michael E. Gans**
*Clerk of Court*

VOICE (314) 244-2400
FAX (314) 244-2780
www.ca8.uscourts.gov

December 23, 2020

Ms. Judith Mack O'Donohoe
ELWOOD & O'DONOHOE
116 N. Main Street
P.O. Box 307
Charles City, IA  50616-0307

RE:  19-2323  Twyla Mcelree, et al v. City of Cedar Rapids, et al

Dear Counsel:

The court has issued an opinion in this case. Judgment has been entered in accordance with the opinion. The opinion will be released to the public at 10:00 a.m. today. Please hold the opinion in confidence until that time.

Please review Federal Rules of Appellate Procedure and the Eighth Circuit Rules on post-submission procedure to ensure that any contemplated filing is timely and in compliance with the rules. Note particularly that petitions for rehearing and petitions for rehearing en banc must be received in the clerk's office within 14 days of the date of the entry of judgment. Counsel-filed petitions must be filed electronically in CM/ECF. Paper copies are not required. No grace period for mailing is allowed, and the date of the postmark is irrelevant for pro-se-filed petitions. Any petition for rehearing or petition for rehearing en banc which is not received within the 14 day period for filing permitted by FRAP 40 may be denied as untimely.

Michael E. Gans
Clerk of Court

NDW

Enclosure(s)

cc:     Mr.  Clerk, U.S. District Court, Northern Iowa
        Ms. Elizabeth Jacobi
        Mr. Nathan M. Kooker
        Mr. Mohammad H. Sheronick
        Mr. Wilford H. Stone
        Mr. Gregory Thomas Usher

District Court/Agency Case Number(s):   1:17-cv-00144-KEM

# United States Court of Appeals
*For The Eighth Circuit*
Thomas F. Eagleton U.S. Courthouse
111 South 10th Street, Room 24.329
**St. Louis, Missouri 63102**

**Michael E. Gans**
*Clerk of Court*

VOICE (314) 244-2400
FAX (314) 244-2780
www.ca8.uscourts.gov

December 23, 2020

West Publishing
Opinions Clerk
610 Opperman Drive
Building D D4-40
Eagan, MN 55123-0000

   RE: 19-2323 Twyla Mcelree, et al v. City of Cedar Rapids, et al

Dear Sirs:

  A published opinion was filed today in the above case.

  Counsel who presented argument on behalf of the appellant and appeared on the brief was Judith Mack O'Donohoe, of Charles City, IA.

  Counsel who presented argument on behalf of the appellees and appeared on the brief was Wilford H. Stone, of Cedar Rapids, IA. The following attorneys also appeared on the appellee brief; Mohammad H. Sheronick, of Cedar Rapids, IA., Elizabeth Jacobi, of Cedar Rapids, IA., Nathan M. Kooker, of Cedar Rapids, IA.

  The judge who heard the case in the district court was Honorable Leonard T. Strand. The judgment of the district court was entered on May 23, 2019.

  If you have any questions concerning this case, please call this office.

            Michael E. Gans
            Clerk of Court

NDW

Enclosure(s)

cc: MO Lawyers Weekly

  District Court/Agency Case Number(s): 1:17-cv-00144-KEM